UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

MARK LOPEZ,

                      Plaintiff,

        v.

COMMISSIONER OF SOCIAL SECURITY,

                      Defendant.

**MEMORANDUM & ORDER**
17-CV-06241 (MKB)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Mark Lopez commenced the above-captioned action pursuant to 42 U.S.C.

§ 405(g), seeking review of a final decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying his claim for Social Security disability insurance

benefits under the Social Security Act (the "SSA").  (Compl., Docket Entry No. 1.)  Plaintiff

moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, arguing that (1) Administrative Law Judge Ifeoma N. Iwuamadi (the "ALJ") erred by

failing to properly assess the impact of Plaintiff's obesity, and (2) the Appeals Council erred in

failing to properly consider new evidence submitted after the ALJ's decision.  (Pl. Mot. for J. on

the Pleadings ("Pl. Mot."), Docket Entry No. 9.)  The Commissioner cross-moves for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, arguing that the

Court should affirm the ALJ's decision because it is legally correct and supported by substantial

evidence.  (Comm'r Cross-Mot. for J. on the Pleadings ("Comm'r Mot."), Docket Entry No. 10;

Comm'r Mem. in Supp. of Comm'r Mot. ("Comm'r Mem."), Docket Entry No. 11.)  For the

reasons discussed below, the Court grants Plaintiff's motion for judgment on the pleadings,

denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case for

further proceedings consistent with this Memorandum and Order.

## I.  Background

Plaintiff was born in 1970 and attended high school through the tenth grade.  (Certified Admin. Record ("R.") 182, 303, Docket Entry No. 7.)  On November 20, 2013, Plaintiff filed an application for disability insurance benefits, claiming that he had been disabled since April 19, 2013.  (R. 182, 269.)  On February 15, 2014, the Social Security Administration issued a decision denying Plaintiff's application.  (R. 185–92.)  Plaintiff subsequently requested a hearing before an administrative law judge, (R. 193–94), which occurred on January 28, 2016, (R. 135–81.)  By decision dated May 4, 2016, the ALJ determined that Plaintiff was not disabled.  (R. 23–43.)  On August 30, 2017, the Appeals Council denied review, rendering the ALJ's decision the Commissioner's final decision.  (R. 14–19.)  Plaintiff filed a timely appeal with the Court.  (Compl.)

### a.  Hearing before the ALJ

Plaintiff appeared in person at the January 28, 2016 administrative hearing with counsel.  (R. 137.)  The ALJ heard testimony from Plaintiff and from David Festa, a vocational expert, who appeared by telephone.  (R. 137.)

#### i.  Plaintiff's testimony

Plaintiff is five feet six inches tall and weighs approximately 230 to 240 pounds.  (R. 143.)  Plaintiff became disabled on April 19, 2013 and has not done any work for pay since then.  (R. 143.)  Plaintiff receives food stamps and cash assistance, and has tried to find work through Fedcap Rehabilitation Services, Inc. ("Fedcap"), but he "couldn't take it because of all the pain and the surgical procedure that [Plaintiff is] supposed to have."  (R. 144.)

From March of 2008 to April of 2008, Plaintiff worked as a "fire assistant," tasked with

"taking the fire extinguishers out of the establishments and putting the new ones in the establishments, and servicing them" with the help of a senior technician. (R. 145, 168.) Plaintiff lifted and carried approximately twenty to thirty pounds while working as a fire assistant. (R. 168.) From 2009 to 2012, Plaintiff worked as a "porter maintenance person," where he would "[c]lean, [take out the] garbage, climb ladders, do sweeping [and] mopping, . . . clean mirrors, . . . [and] run the elevator." (R. 144–45.) In that role, Plaintiff lifted or carried sixty to eighty pounds per day and walked or stood all day. (R. 167.) Plaintiff stopped working as a porter because he "had quite a few surgeries" and "overextended [his] medical leave." (R. 146.)

Before he became disabled, Plaintiff drove a taxi for hire for "maybe a month or two" three or four times a week depending on how he felt. (R. 164–66.) In that role, Plaintiff earned about thirty to forty dollars each day. (R. 166.) Plaintiff stopped working as a taxi driver because it involved "too many hours sitting upright," (R. 165), his employer "started getting a little upset" that Plaintiff could not work a full eight-hour day, (R. 166), and Plaintiff was spending more money on gas than he made per day, (R. 166).

Plaintiff became disabled on April 19, 2013 due to problems with his shoulders and back, gout, asthma, and psychological issues. (R. 146.) Every day, Plaintiff suffers from chronic "[s]tabbing pain, sharp pain, [and] numbness." (R. 147.) Plaintiff also suffers from arthritis, herniated discs, and bulging discs, that "need to be surgically taken care of." (R. 157, 158.) Plaintiff's pain on scale of one to ten is a nine, and he does not take any pain medication. (R. 147–48.) Plaintiff has had cervical spine fusion surgery, (R. 169), chest reduction surgery, (R. 169–70), three surgeries on his right shoulder, (R. 153), and three surgeries on his left shoulder, (R. 153). At the time of the administrative hearing, Plaintiff was scheduled for a fourth surgery to his left shoulder. (R. 153.)

Plaintiff has "to stay away from different foods and drinks" to control his gout. (R. 149.) If Plaintiff does not avoid certain foods and drinks, gout "appears on parts of [his] body" and "[t]he swelling and the pain attacks" his joints, bones, feet, elbow, knees, and ankles. (R. 149.) Gout "affects [Plaintiff's] joints so bad . . . [that] it popped out [his] bone in [his] elbow" and "popped out the bone on [his] feet." (R. 150.) When gout "attacks [Plaintiff's] joints, it leaves a big bump on [his] elbow and on [his] feet." (R. 150.) The pain intensity of Plaintiff's gout, on a scale of one to ten, is a ten or more. (R. 169.) Plaintiff takes Colchicine to control his gout, but it does not help his symptoms or pain. (R. 148–49.) Plaintiff plans "to go back to [his] doctor to see if [the doctor] c[an] prescribe [him] a medicine called Uloric that will control [Plaintiff's gout]." (R. 149.) Plaintiff usually takes Prednisone for pain, but was not taking the medication at the time of the hearing. (R. 149.)

Plaintiff has suffered from asthma for over fifteen years. (R. 150.) Plaintiff has to "stay away from smoke" and when he "catch[es] an attack, it gets bad where [he has] to be hospitalized." (R. 150.) In or about November of 2015, Plaintiff was hospitalized due to an asthma attack. (R. 150.) Plaintiff takes Spiriva and Symbicort, which help control his asthma. (R. 151.) In addition, Plaintiff has "a lot of allergy problems and sinus problems" and is allergic to dust mites, dirt, trees, grass, and pets. (R. 152.) Plaintiff "can't smell or . . . taste" and has had approximately six or seven polyp surgeries. (R. 152.)

Plaintiff has been hospitalized at least seven times due to psychiatric issues. (R. 170.) Plaintiff has tried to hurt himself, is depressed and hopeless with little energy, and has difficulty with concentration and memory. (R. 172.) Plaintiff has also been diagnosed with schizophrenia, and when he does not take his medication, he suffers from "the voices and the visions." (R. 154.) While Risperdal "controls" Plaintiff's schizophrenia, he suffers from side effects,

including twitching and nervousness.  (R. 154–55.)  During the hearing, Plaintiff's attorney noted that Plaintiff's right leg and right hand were "constantly shaking," (R. 154–55), and Plaintiff testified that his hand and leg "[p]retty much" constantly shake, (R. 167).  In January of 2015, Plaintiff was not taking his medication and suffered from hallucinations.  (R. 155–56.)  He was subsequently hospitalized for about five days.  (R. 155–56.)

Plaintiff can walk one block before needing to stop "for a minute or two," because he feels pain in his knees, back, and neck while walking.  (R. 157.)  He can stand for five to eight or nine minutes at a time, and can sit for about twenty or thirty minutes at a time.  (R. 158.)  Plaintiff can lift "five pounds [at] the most, like a gallon of milk," though "that even hurts."  (R. 158–59.)  Plaintiff can lift his hands "by [his] head," but it hurts to do so.  (R. 159.)  When Plaintiff "reach[es] all around, in front of [him,] . . . the pain is constant" in his shoulder, and when he moves his hands, he "get[s] numbness" in his hands and arms.  (R. 159, 160.)  Plaintiff is able to move his fingers.  (R. 160.)  Plaintiff feels numbness every day, even while laying down.  (R. 160.)

Plaintiff lives with his brother and his brother's wife.  (R. 161.)  "[O]n a daily basis," Plaintiff "pretty much lay[s] down for comfort of [his] . . . physical condition," (R. 161), although he has to shit from his left side to his right side even while laying down, (R. 158.)  Plaintiff sometimes reads or watches "a little bit" of television.  (R. 161.)  Plaintiff is able to read for about five minutes at a time, but when he goes back to his reading materials, he cannot remember what he read before.  (R. 172.)

When Plaintiff was working he was "independent in cooking, cleaning, laundry, and shopping[,] . . . showering, dressing, and grooming," however, after Plaintiff's "surgery and everything else, it stopped."  (R. 161.)  Plaintiff's brother "does the cooking," Plaintiff "go[es]

with" his brother's wife to do the laundry, and Plaintiff's brother and his brother's wife grocery shop, though Plaintiff provides them with food stamps for groceries.  (R. 162.)  Plaintiff is able to drive, but because of an unpaid ticket, he does not do so.  (R. 162.)  The last time that Plaintiff drove was in 2012.  (R. 162.)  When Plaintiff has appointments, he uses a cab service paid for by Medicaid.  (R. 163.)  Plaintiff sometimes take the bus, but avoids the train because of the stairs.  (R. 163–64.)  When Plaintiff takes the bus, he has trouble stepping onto the platform to get onto the bus.  (R. 173.)

### ii.   Vocational expert testimony

David Festa, the vocational expert, testified by telephone after reviewing the exhibit file and listening to Plaintiff's testimony.  (R. 173–74.)  Festa classified Plaintiff's job as a porter maintenance person as heavy exertional work, unskilled with a specific vocational preparation ("SVP") of two.  (R. 175.)  He classified Plaintiff's job as a "fire assistant" as medium exertional work, unskilled with an SVP of three, and classified Plaintiff's job as a taxi driver as medium exertional work, semiskilled with an SVP of three.  (R. 175.)

The ALJ asked Festa to assume a hypothetical individual of Plaintiff's age and education level with Plaintiff's past jobs.  (R. 175.)  The ALJ instructed Festa to assume that the hypothetical individual "is limited to less than full range of sedentary" and with the following characteristics:

> Sit, stand at will in the vicinity of the work station.  Push, pull as much as lift, carry.  Overhead reach occasional.  No foot controls, and reach all around frequently.  Climb ramps and stairs occasional.  Climb ladders and scaffolds never.  Kneel, crouch, crawl never.  Avoid concentrated exposure.  And limited to simple-work related decisions, and occasional contact with supervisors, coworkers, and no contact with the public.

(R. 175–76.)  Festa opined that such a person could not perform any of Plaintiff's past jobs or any other job.  (R. 176.)  Festa testified that if the hypothetical individual could have occasional

contact with the public, the person would be able to work as an addresser, order clerk, or table worker.  (R. 176–77.)  The ALJ then asked Festa to assume a hypothetical person with the same restrictions except that the individual would also be absent from work for two days per month.  (R. 177.)  Festa testified that there would be no jobs available in the national economy on a full-time consistent basis for such an individual.  (R. 177–78.)

### b.  Medical evidence

#### i.  Joshua N. Steinvurzel, M.D.

On December 14, 2012, Plaintiff met with Joshua N. Steinvurzel, M.D., complaining of constant shoulder pain and "clicking involving the left shoulder" that developed six weeks before the meeting.  (R. 392.)  Dr. Steinvurzel's notes from the visit indicate that "MR arthogram films and report . . . show[ed] non displaced re-tear of the superior labrum with post surgical changes," and an intact rotator cuff.  (R. 394.)  Plaintiff was instructed to rest, and indicated that he wanted to proceed with surgical intervention.  (R. 394.)  Dr. Steinvurzel "advised that the best procedure would be to perform a [debridement] of the shoulder with subpectoralis biceps tenodesis."  (R. 394.)

On January 11, 2013, Plaintiff met with Dr. Steinvurzel for a postoperative visit "after undergoing bicep tenodesis of his left shoulder" on January 2, 2013.  (R. 395.)  Plaintiff reported mild postoperative pain, and that he was recovering at home.  (R. 395.)  Dr. Steinvurzel provided Plaintiff with handouts "showing home exercises."  (R. 397.)  Plaintiff met with Dr. Steinvurzel again on February 8, 2013 for a second postoperative visit.  (R. 408.)  Dr. Steinvurzel's notes from that visit indicate that he instructed Plaintiff to "[c]ontinue home exercise program."  (R. 409.)  Dr. Steinvurzel also "reassured [Plaintiff] that it [would] take more time for him to recover and that [Dr. Steinvurzel would] reassess [Plaintiff] in about one month to see if he

[could] return to work." (R. 409.)

On March 1, 2013, Plaintiff met with Dr. Steinvurzel again for a "[p]ost-operative visit for shoulder arthroscopy." (R. 400.) Plaintiff reported "a significant amount of postoperative pain," and was "recovering at home and ha[d] been receiving physical therapy." (R. 400.) Dr. Steinvurzel instructed Plaintiff to "[c]ontinue home exercise program." (R. 402.) Plaintiff returned for another follow up visit on April 22, 2013, again reporting "a significant amount of postoperative pain." (R. 415.) Dr. Steinvurzel recommended a therapeutic injection, after which Plaintiff "felt moderate relief," (R. 416), and gave Plaintiff "[a] script for physical therapy," (R. 417). On May 28, 2013, Plaintiff returned to Dr. Steinvurzel and reported "mild postoperative pain." (R. 421.) Plaintiff stated he had "improvement since he has been going to therapy," but complained of "continued pain in his neck and lower back since [a] recent car accident." (R. 421.)

### ii. Paul Herman, Ph.D.

On December 17, 2013, Plaintiff was evaluated by Paul Herman, Ph.D. (R. 383.) Plaintiff "drove himself [fourteen] miles to th[e] evaluation," and, at the time of Dr. Herman's evaluation, lived alone. (R. 383.) Dr. Herman's notes from his meeting with Plaintiff indicate that Plaintiff dropped out of high school because of family difficulties and academic and behavioral problems in school. (R. 383.) Plaintiff presented with a history of neck, sinus, rotator cuff, back, feet, and testicular problems, as well as asthma, gout, and gastritis. (R. 383.) Dr. Herman noted that Plaintiff had undergone breast reduction surgery. (R. 383.) He described Plaintiff's "current functioning" as including "difficulty falling asleep," "unspecified weight loss," and "a lot of sadness in his life because both of his parents have died," he lost his job, has medical problems, and "has no money, and . . . no where to turn." (R. 383.) Dr. Herman found

Plaintiff to be "cooperative with adequate social skills," casually dressed, and adequately groomed. (R. 384.)

Dr. Herman's evaluation indicates that Plaintiff has "people with whom he socializes, but has somewhat distant family relationships," and that Plaintiff's hobbies and interests include the radio, reading, socializing with friends, and going to the gym and church. (R. 385.) Dr. Herman's medical source statement indicates that "there d[id] not appear to be evidence of significant limitation with respect to [Plaintiff's] ability to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration at a level sufficient for low-level employment, maintain a regular schedule, learn new tasks, make appropriate simple work-related decisions, and relate adequately to others" but that "there appear[ed] to be evidence of moderate limitation with respect to [Plaintiff's] ability to perform complex tasks and appropriately deal with stress." (R. 385.) Dr. Herman diagnosed Plaintiff with "[a]djustment disorder with depressed mood," and "[p]roblems with neck, sinus, rotator cuff, gout, gastritis, back, feet, and testicles." (R. 386.) He advised that Plaintiff "may benefit from psychotherapy," and indicated that Plaintiff's prognosis was fair. (R. 386.)

### iii.  Chaim Shtock, D.O.

On December 27, 2013, Plaintiff met with Chaim Shtock, D.O., for an orthopedic examination. (R. 377.) According to Dr. Shtock's report from that examination, Plaintiff has a history of neck and lower back problems that started in 1999. (R. 377.) Plaintiff underwent cervical spine fusion surgery in 1999, chest reduction surgery due to obesity in 2001 or 2002, right shoulder surgery in 2001, sinus surgery due to polyps in 2010, and left shoulder surgeries in 2010 and 2012. (R. 377–78.) Plaintiff also has a history of gastritis, gout, and asthma. (R. 378.)

Plaintiff "presented with complaint of bilateral shoulder pain; right shoulder 6/10, left

shoulder 7 to 8 out of 10[;] . . . neck pain[,] 8 to 9 out of 10[;] [l]ower back pain and upper bank

pain[,] 7 to 8 or 9 out of 10." (R. 377–78.) Dr. Shtock reported that Plaintiff's shoulder pain "is

aggravated with overhead reaching, lifting, and carrying heavy objects," (R. 377), and his back

pain "is aggravated with prolonged sitting, standing, heavy lifting, and prolonged walking."

(R. 378.) However, Plaintiff was "independent in cooking, cleaning, laundry, and shopping[;] . .

. showering, dressing, and grooming." (R. 378.) At the time of the evaluation, Plaintiff cooked

twice a week, cleaned once a month, listened to the radio, read books, and socialized with

friends. (R. 378.)

Dr. Shtock noted that Plaintiff is obese and declined to walk on his heels and toes.

(R. 379.) At the evaluation, Plaintiff "was unable to squat beyond 30% maximum capacity,"

presented without an assistive device, and did not need help changing for the exam or getting on

or off of the exam table. (R. 379.) Dr. Shtock's medical source statement indicates that Plaintiff

"has moderate limitation with heavy lifting[,] . . . moderate to marked limitation with squatting[,]

. . . [m]oderate limitation with kneeling[,] . . . [and] mild to moderate limitations with walking

long distance." (R. 380.) Dr. Shtock opined that Plaintiff has mild limitation with standing for

long periods of time or sitting for long periods of time, and mild limitation with frequent bending

and performing overhead activities. (R. 380.) Plaintiff's prognosis was fair. (R. 380.) Dr.

Shtock advised Plaintiff to "monitor [his] blood pressure and follow up with [his] primary

physician." (R. 378.)

### iv.  Subhash Kini, M.D.

In a February 27, 2013 letter to another doctor, Dr. Subhash Kini, M.D., wrote that after

meeting Plaintiff, Dr. Kini determined that Plaintiff "suffers from severe obesity," weighs 305.4

pounds, and "suffers from multiple medical problems related to his obesity." (R. 413.) Dr. Kini

also indicated that "[b]ecause of his severe obesity, [Plaintiff] is interested in having weight-loss surgery performed," and Dr. Kini recommended that Plaintiff undergo a sleeve gastrectomy. (R. 413.)

### v. Ian M. Storch, D.O.

In a March 6, 2013 letter, Ian M. Storch, D.O., indicated that an examination of Plaintiff revealed that Plaintiff has "problems with his weight" and has "been having stomach pains for a year." (R. 403.) Plaintiff's stomach pains were "sharp and in the epigastric/right quadrant," and Plaintiff recently felt a "bump" in his stomach and has had a loss of appetite. (R. 403.) In a March 13, 2013 letter, Dr. Storch states that Plaintiff "has not had any improvement in his pain," but was "returning to work soon" and was "under a significant amount of stress." (R. 411.) Though Plaintiff "complain[ed] of diffuse abdominal pain," Dr. Storch opined that Plaintiff had "no red flag signs." (R. 412.) Dr. Storch "recommended [Plaintiff] increase his Prilosec to twice a day," and "start low-dose trazodone to treat the brain gut axis." (R. 412.)

### vi. Dr. Saul F. Maslavi, M.D.

Dr. Saul F. Maslavi, M.D., began treating Plaintiff in September of 2008. (R. 477.) On March 2, 2013, Plaintiff complained to Dr. Maslavi about "epigastric pain," (R. 459), and the two discussed "nutrients" including "[p]rotein, carbohydrates, [and] fat" and that calories "need to be removed from daily intake for weight loss," (R. 458). Dr. Maslavi "encouraged exercise [and] walking." (R. 458.) Dr. Maslavi assessed Plaintiff with "acute gastritis without mention of hemorrhage," "hypertension, benign," and "morbid obesity." (R. 460.)

Plaintiff met with Dr. Maslavi again on April 6, 2013, and complained of palpitations. (R. 461.) Dr. Maslavi assessed Plaintiff with "pharyngitis, acute," "morbid obesity," "hypertension, benign," and "palpitations." (R. 462.) He also "[d]iscussed [the] calorie content

of regular soda, which can lead to weight gain," with Plaintiff, as well as "examples of high calorie item[s]," and simple sugars. (R. 388.) Dr. Maslavi instructed Plaintiff to add whole grain foods to his diet and eliminate simple sugars and encouraged Plaintiff to exercise. (R. 388.)

At an April 27, 2013 meeting with Dr. Maslavi, Plaintiff complained of shoulder and knee pain. (R. 463.) Dr. Maslavi assessed Plaintiff with "morbid obesity," "hypertension, benign," "pain in joint, shoulder region," and "pain, knee." (R. 464.) On May 7, 2013, Dr. Maslavi discussed diet and exercise with Plaintiff. (R. 466.) Dr. Maslavi instructed Plaintiff to "[d]ecrease fried foods, soda or other sugar sweetened beverages," "[d]ecrease snacking between meals," and encouraged him to exercise and walk. (R. 467.)

Plaintiff met with Dr. Maslavi again on June 3, 2013. (R. 468.) Plaintiff complained of a cough, and Dr. Maslavi noted that Plaintiff suffered from "allergic rhinitis, cause unspec[ified]," "pain, knee," "morbid obesity," "chronic renal failure," and "hypertension, benign." (R. 468, 469.) He again instructed Plaintiff to "[d]ecrease fried foods, soda or other sugar sweetened beverages," "[d]ecrease snacking between meals," and encouraged Plaintiff to exercise and walk. (R. 390.)

On June 29, 2013, Dr. Maslavi wrote a letter "to whom it may concern" indicating that Plaintiff "has suffered with obesity for many years despite several attempts at weight loss," and suffers from morbid obesity, asthma, hypertension, generalized osteoarthrosis, and "other health problems." (R. 477.) Dr. Maslavi opined that "[s]ubstantial weight loss is required to alleviate these health problems." (R. 477.) Dr. Maslavi also noted that Plaintiff has "participated in a monitored, structured weight loss program in [Dr. Maslavi's] office that includes at least [four] monthly visits with weigh-ins, nutritional evaluation, education regarding diet and ongoing discussion regarding the importance of physical activity and exercise." (R. 477.) Plaintiff "has

been counseled repeatedly on the risks of developing further co-morbid conditions due to severe obesity," and his attempts to lose weight have included an exercise program available at a local gym and nutritional counseling. (R. 477.) However, Dr. Maslavi wrote that "despite best efforts," Plaintiff's "weight loss is not substantial enough to significantly improve overall health," and "the only reasonable alternative is weight loss surgery." (R. 477.)

On July 8, 2013, Plaintiff met with Dr. Maslavi and reported that he had broken up with his fiancé and that he was feeling nervous and "very anxious." (R. 471.) Dr. Maslavi assessed Plaintiff as suffering from "anxiety state, unspec[ified]," "hypertension, benign," and "obesity, nos." (R. 472.) On August 8, 2013, Plaintiff complained to Dr. Maslavi about "[e]pigatric pain." (R. 473.) Dr. Maslavi examined Plaintiff, and diagnosed him with acute pancreatitis. (R. 597.) Dr. Maslavi opined that Plaintiff suffers from "acute gastritis without mention of hemorrhage," "pancreatitis, acute," "morbid obesity," "obesity, nos," and "hypertension, benign." (R. 474.) He also opined that Plaintiff was able to work, but that his maximum tolerance for lifting, carrying, and pushing/pulling was zero to ten pounds. (R. 597.) In addition, Dr. Maslavi opined that Plaintiff had no limitation in walking, climbing, standing, stooping/bending, or sitting. (R. 597.)

### vii.  Scott W. Mandel, M.D.

Dr. Maslavi referred Plaintiff to Dr. Scott W. Mandel, M.D., for a pre-operative evaluation and risk stratification. (R. 683.) On June 10, 2013, Dr. Mandel noted that Plaintiff's heart rate and blood pressure responses to testing were normal, but that his "[s]ymptoms during [the] stress test" included fatigue and dyspnea. (R. 683.)

### viii.  Tamekia Wakefield, M.D.

Dr. Tamekia Wakefield, M.D., examined Plaintiff on January 28, 2014. (R. 601.)

Plaintiff complained of chronic nasal congestion, (R. 601), and Dr. Wakefield opined that Plaintiff's septum was deviated and that his polyps were "moderate," (R. 606).

### ix.    Dr. Gerald D. Suh, M.D.

On February 19, 2014, Plaintiff met with Dr. Gerald D. Suh, M.D., complaining of chronic nasal congestion, decreased smell and taste, and chronic pressure.  (R. 631.)  Dr. Suh noted that a recent cat scan showed "massive pansinusitis."  (R. 631.)  On March 14, 2014, Plaintiff underwent sinus surgery.  (R. 640.)  The operative report from Plaintiff's surgery indicates that Plaintiff "had a history of chronic severe nasal congestion and sinus pressure as well as decreased smell for years."  (R. 640.)  On March 27, 2014, Plaintiff met with Dr. Suh again for a post operative visit and was "[s]till severely congested," but experiencing "less pain." (R. 619.)  Plaintiff met with Dr. Suh on April 9, 2014, for a follow up visit and had "nasal pain [and] decreased smell," that was "slowly improving."  (R. 616.)  After examining Plaintiff, Dr. Suh assessed Plaintiff with chronic ethmoid sinusitis, chronic maxillary sinusitis, and chronic rhinitis. (R. 618.)

Plaintiff was scheduled for a bilateral maxillary antrostomy, bilateral frontal sinusotomy, bilateral sphenoidotomy, and bilateral ethmoidectomy on April 26, 2016.  (R. 910).  Dr. Suh instructed that Plaintiff could return to work on May 3, 2016, and return to normal activities on May 10, 2016.  (R. 911.)

### x.    Zoraida Diaz, LMSW

On January 22, 2015, Plaintiff met with Zoraida Diaz, LMSW.  (R. 538.)  Diaz's notes from that meeting indicate that Plaintiff suffers from severe mental health issues, and Plaintiff believed that a voodoo act was put on him.  (R. 538.)  Plaintiff also complained that his "father's family put a curse on [him]," and that he hears voices and has visions.  (R. 538.)  Plaintiff stated

that he "lost everything, my [fiancé], my disability, and now I don't have the medications."

(R. 538.)  Diaz's report indicates that Plaintiff had been hospitalized about seven times.

(R. 539.)  When asked about suicide attempts, Plaintiff said "I don't have the galls to do it but I

asked God to take me," and when asked about violence, he stated "I don't start anything but if

the negative starts I can be."  (R. 539.)  Plaintiff also reported feeling down, depressed, or

hopeless, tired or having little energy, and poor appetite or overeating nearly every day.

(R. 539.)  He also reported not being able to stop or control worrying, worrying too much about

different things, having trouble relaxing, and feeling afraid as if something awful might happen

nearly every day.  (R. 540.)  Diaz concluded that Plaintiff "has a history of [s]chizophrenia and

was on [d]isability as well as medications that were helping him . . . .  [Plaintiff] decided to start

working but was unable to continue working [and] after several years thereafter he lost his

disability, his girlfriend, and eventually his apartment leaving him in a hopeless state."  (R. 543.)

### xi.  Sreenivasa Sanikam, M.D.

On February 10, 2015, Plaintiff met with Dr. Sreenivasa Sanikam, M.D.  (R. 553.)  In his

report from that meeting, Dr. Sanikam noted that Plaintiff's diagnoses included "[b]ipolar I

disorder, most recent episode (or current) manic, severe, without mention of psychotic behavior."

(R. 553.)  Dr. Sanikam also noted that he discussed with Plaintiff the "risk and benefit of

medication and potential side effects such as metabolic syndrome of abnormal; [b]lood sugar,

[h]ypertension[,] [c]holesterols[,] and weight gain caused by certain medications."  (R. 554.)

Plaintiff met with Dr. Sanikam again on February 24, 2015, (R. 570), and March 24, 2015,

(R. 577), and at both visits Plaintiff "[o]ffered no complaints," and was "[d]oing well."  (R. 571,

578.)  In addition, at both visits, Dr. Sanikam and Plaintiff discussed the risks and benefits of

medication, and potential side effects.  (R. 571, 578.)

### xii.   Karen Fung, LMSW

On March 24, 2015, Plaintiff met with Karen Fung, LMSW.  (R. 581.)  Fung's notes indicate that Plaintiff appeared "in an anxious mood and congruent affect," and "was non engaging and guarded."  (R. 581.)  Plaintiff met with Dr. Fung again on January 4, 2016 and Fung noted that Plaintiff "appear[ed] to be in a[n] anxious mood and congruent affect," and was "unable to remain still during [the] session."  (R. 835.)  Plaintiff reported that he had been homeless for the past year but recently moved into his brother's home.  (R. 835.)  On January 12, 2016, Dr. Fung diagnosed Plaintiff with bipolar disorder, asthma, and gout.  (R. 842.)  Dr. Fung opined that Plaintiff was under the following stressors: "economic problems, housing problems, other psychosocial or environmental problems, problems related to social environment and problems with primary support group."  (R. 842.)  Dr. Fung reported that Plaintiff "has a history of suicide gestures and ideation, recent ideation due to circumstances but denies an actual plan, knows that he will respond well to Risperdal."  (R. 843.)

### xiii.   Michael Caramihai, M.D., D.O.

On December 5, 2015, Dr. Michael Caramihai, M.D., D.O., wrote a letter stating that Plaintiff "has been seen in [his] office for multiple chronic conditions," including "considerable pain resulting from neck surgery, bilateral shoulder surgeries, thoracic and lumbar discopathies, as well as [s]chizophrenia, COPD[,] and gout."  (R. 777.)  Dr. Caramihai also indicated that Plaintiff was evaluated by an orthopedic surgeon and was scheduled for left shoulder surgery on January 25, 2016.  (R. 777.)  The letter notes: "[i]n his current state of health[,] [Plaintiff] is unable to either sit or stand for prolonged periods of time."  (R. 777.)

### xiv.   Dr. Jose Baez, M.D.

On December 7, 2015, Plaintiff met with Dr. Jose Baez, M.D.  (R. 850.)  Plaintiff

reported hearing voices and "[f]eeling people[] talking about him." (R. 850.) Dr. Baez noted that Plaintiff has a "[l]ong history of mental illness that started [at] [twenty] years old," and that Plaintiff appeared with a "suspicious" facial expression, appropriate grooming, and appropriate eye contact. (R. 851.) However, Dr. Baez noted that Plaintiff's affect was flat. (R. 851.) Dr. Baez diagnosed Plaintiff with bipolar disorder, asthma, gout, and other psychosocial or environmental problems. (R. 854.) Plaintiff's symptoms were "mild," and his prognosis was "fair." (R. 854.)

### c. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the SSA. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 19, 2013, the alleged onset date of his disability. (R. 25.) Although Plaintiff had worked after the alleged disability onset date, the ALJ found that this work was an unsuccessful work attempt. (R. 25.) Second, the ALJ found that Plaintiff had the following severe impairments: impingement syndrome of the shoulders, a superior glenoid labrum lesion, status-post bilateral shoulder surgeries, asthma, obesity, sinusitis and chronic rhinitis, nasal polyps, and schizophrenia. (R. 25.) The ALJ also found that Plaintiff had the following non-severe impairments: gout, gastritis, hypertension, and acute pancreatitis. (R. 26.)

Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or was equal to the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 26.) The ALJ found that there was no basis to conclude that any additional and cumulative effects of obesity limit Plaintiff's ability to perform sedentary work, and explained that Plaintiff's mental impairment of schizophrenia does not meet the requirements of the relevant impairment listed in Appendix 1 of the Social Security Regulations.

(R. 26.)

Next, the ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform a substantial range of sedentary work. (R. 30.) The ALJ found that Plaintiff is able to sit, stand, and walk for a total of eight hours in an eight-hour workday, with the ability sit or stand at will in the vicinity of the workstation. (R. 30.) In addition, the ALJ found that Plaintiff can occasionally reach overhead, frequently reach all other directions, and occasionally climb ramps and stairs. (R. 30.) However, the ALJ concluded that Plaintiff can never climb ladders or scaffolds, kneel, crouch, or crawl, and must avoid concentrated exposure to dust, odors, fumes, and pulmonary irritants. (R. 30.) The ALJ found that Plaintiff's "nonexertional impairments limit him to performing simple, routine tasks; to making simple work-related decisions; and to occasional contact with supervisors, coworkers, and the public." (R. 30.)

In making this RFC determination, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 30.) The ALJ "also considered opinion evidence." (R. 30.) The ALJ found that the record confirmed Plaintiff's shoulder surgeries, complaints of physical pain, and obesity. (R. 30–31.) The ALJ noted that in 2013, Plaintiff weighed over 300 pounds, Plaintiff's doctors encouraged him to exercise and walk, and Plaintiff discussed weight loss surgery with his doctors. (R. 31.) In addition, the ALJ noted that although Plaintiff was medically cleared for surgery as of July of 2013, the surgery "does not appear to have been performed, with no explanation in the record." (R. 31.) The ALJ also considered a December 27, 2013 consultative orthopedic examination by Dr. Shtock, during which Plaintiff reported a 2001 or 2002 chest reduction surgery due to obesity. (R. 32.)

The ALJ assigned considerable weight to the opinions of Dr. Shtock, who performed a

consultative orthopedic examination of Plaintiff. (R. 39–40.) The ALJ accorded significant weight to the opinions of Dr. Maslavi in his assessment of Plaintiff in August of 2013, opining that Plaintiff was able to lift and carry up to ten pounds. (R. 40.) However, the ALJ assigned less weight to Dr. Maslavi's opinion that Plaintiff had no limitations in sitting, standing, or walking, "as the [Plaintiff] is given the benefit of the doubt that he must be able to sit/stand at will at the workstation due to the additional impairments [Plaintiff] mentioned at his hearing." (R. 40.) The ALJ gave little weight "to the opinions of Dr. Thomas in the Biopsychosocial Summary . . . that Plaintiff should limit/eliminate lifting, pushing, pulling, carrying, stooping, bending and reaching; is limited to a low stress work environment; and should avoid dust, smoke, odor, and fumes" because "these opinions are vague, and inconsistent with the medical evidence as a whole." (R. 40.)

As to Plaintiff's mental impairment, the ALJ gave considerable weight to the opinions of Dr. Herman, who performed a consultative psychiatric evaluation; Dr. Baez, who noted in December of 2015 and January of 2016 that Plaintiff was stable on medications; and Dr. Diaz, who gave Plaintiff a GAF score of 41-50, in the "serious symptoms" range, when Plaintiff presented at the hospital unmedicated with acute symptoms from schizophrenia. (R. 40.)

Fourth, the ALJ determined that Plaintiff is unable to perform any past relevant work. (R. 41.) Fifth, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform a significant number of jobs that existed in the national economy. (R. 41.)

#### d. New evidence

After the ALJ's decision, Plaintiff provided medical source statements from Dr. Caramihai and Dr. Baez to the Appeals Council. (R. 1–11.) The Appeals Council found that "this evidence does not show a reasonable probability that it would change the outcome of the [ALJ's] decision," and therefore "did not consider and exhibit this evidence." (R. 15.)

#### i. Dr. Caramihai's medical source statement

On June 7, 2016, approximately one month after the ALJ rendered her decision, Dr. Caramihai authored a medical source statement. (R. 1–5.) In this statement, Dr. Caramihai stated that since November of 2015, he has had five appointments with Plaintiff. (R. 1.) Dr. Caramihai explained that Plaintiff has "[i]ntractable pain due to b/l shoulder surgeries, neck surgery, thoracic or lumbar discopathy, schizophrenia, depression, asthma/COPD, [and] gout." (R. 1.) Dr. Caramihai stated that Plaintiff's prognosis is poor, and that he suffers from pain, depression, and anxiety. (R. 1). Dr. Caramihai characterized Plaintiff's pain as "constant" in his shoulders, neck, and back, and noted that Plaintiff describes his pain "as sharp, radiating to extremities, 10/10." (R. 1.) Dr. Caramihai also observed that Plaintiff had antalgic gait and "decreased range of motion in both arms." (R. 1.) Dr. Caramihai noted that Plaintiff takes Risperidone and that the side effects "that may have implications for working" include "somnolence and fatigue." (R. 1.) He also stated that "emotional factors contribute to the severity of [Plaintiff's] symptoms and functional limitations" and that Plaintiff suffers from depression and schizophrenia. (R. 2.)

In his report, Dr. Caramihai noted that Plaintiff can walk for one city block without rest or severe pain; sit for twenty minutes at one time before needing to get up, stand for twenty minutes at one time before needing to change positions, and that in an eight-hour working day

with normal breaks, Plaintiff can sit and stand/walk for less than two hours.  (R. 2.)  He stated that Plaintiff "need[s] a job that permits shifting positions at will from sitting, standing, or walking," and "need[s] to include periods of walking around during an [eight-hour] working day."  (R. 2.)  Dr. Caramihai indicated on the left-hand side of his report next to these statements "as per patient."  (R. 2.)

Dr. Caramihai's report indicates that Plaintiff will "sometimes need to take unscheduled breaks during the working day" because of "[p]ain/paresthesias, numbness."  (R. 2–3.)  He opined that Plaintiff will have to take these breaks every hour for an average of ten minutes each.  (R. 2.)  With prolonged sitting, Plaintiff's legs should be elevated, and while standing/walking, Plaintiff must use a cane or other hand-held device for imbalance and pain.  (R. 3.)

Dr. Caramihai's medical source statement also reflects that Plaintiff can rarely lift and carry less than ten pounds and can never lift or carry more than ten pounds; and can never twist, stoop (bend), crouch/squat, climb stairs, or climb ladders.  (R. 3.)  Next to these findings, there is a note that reads: "as per patient."  (R. 3.)

Dr. Caramihai's report also indicates that Plaintiff has "significant limitations with reaching, handling, or fingering," and that Plaintiff can spend five percent of an eight-hour workday: using his hands for grasping, turning, or twisting objects; fingers for fine manipulations; arms for reaching in front of body; and arms for reaching overhead.  (R. 3–4.)  Dr. Caramihai opined that for twenty five percent or more of the workday, Plaintiff's symptoms would likely be "severe enough to interfere with attention and concentration needed to perform even simple work tasks, (R. 4 (emphasis omitted)), and that Plaintiff is "[i]ncapable of even 'low stress' work," (R. 4).  Where the form prompts, "[p]lease explain the reasons for your conclusion," Dr. Caramihai answered: "[Plaintiff] states he cannot concentrate."  (R. 4.)  Dr.

Caramihai also stated that Plaintiff is likely to have "good days" and "bad days" and that he is likely to be absent from work as a result of his impairments or treatment for more than four days per month. (R. 4.) Dr. Caramiahi opined that Plaintiff's impairments "as demonstrated by signs, clinical findings and laboratory or test results" are "reasonably consistent with the symptoms and functional limitations described [in the medical source statement]." (R. 4 (emphasis omitted).) Dr. Caramiahi also indicated that Plaintiff needs to avoid dust, fumes, gasses and hazards due to his asthma/COPD. (R. 4.)

### ii. Dr. Baez's medical source statement

Dr. Baez completed a medical source statement on July 18, 2016, approximately two and a half months after the ALJ's decision. (R. 6–11.) Dr. Baez indicated that he sees Plaintiff for "[m]onthly medication management and psychotherapy," and that as of the date of Dr. Baez's report, there had been "no response or improvement." (R. 6.) Dr. Baez's report indicates that Plaintiff is bipolar and has asthma, gout, chronic physical pain, one kidney, and hypertension, and "problems with support group, economic, housing, psychosocial." (R. 6.) Dr. Baez explained that Plaintiff suffers from side effects from Risperdal, including drowsiness, dizziness, lightheadedness, nausea, and tiredness. (R. 6.) Dr. Baez's "clinical findings" were that Plaintiff "[h]ad one manic episode followed by a major depressive episode." (R. 6.)

As to Plaintiff's "signs and symptoms," Dr. Baez opined that Plaintiff has: "[a]nhedonia or pervasive loss of interest in almost all activities," "[a]ppetite disturbance with weight change," decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, "[r]eccurent obsessions or compulsions which are a source of marked distress," emotional withdrawal or isolation, emotional lability, flight of ideas, and pressures of speech. (R. 7.) Dr. Baez opined that Plaintiff

is "[u]nable to meet competitive standards" in remembering work-like procedures, understanding and remembering very short and simple instructions, maintaining attention for two-hour segments, working in coordination with or proximity to others without being unduly distracted, and completing a normal workday and workweek without interruptions from psychotically based symptoms. (R. 8.) Dr. Baez also opined that Plaintiff is "[s]eriously limited" in carrying out very short and simple instructions, maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, making simple work-related decisions, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions or requesting assistance, and accepting instructions and responding appropriately to criticism from supervisors. (R. 8.) Dr. Baez also stated that Plaintiff is "[u]nable to meet competitive standards" or has "[n]o useful ability to function" in understanding and remembering detailed instructions and carrying out detailed instructions, and is "[u]nable to meet competitive standards" in setting realistic goals or making plans independently of others and dealing with stress of semiskilled and skilled work. (R. 9.)

Dr. Baez opined that Plaintiff has a "[l]imited but satisfactory" ability to maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness and use public transportation, and is "[s]eriously limited" in interacting appropriately with the general public and traveling in unfamiliar places. (R. 9.) He further opined that Plaintiff "find[s] stressful" speed, precision, complexity, deadlines, working within a schedule, being criticized by supervisors, simply knowing that work is supervised, getting to work regularly, remaining at work for a full day, fear of failure at work, making decisions, exercising independent judgment, completing tasks, working with other people, dealing with the public, and dealing with supervisors. (R. 9–10.)

As a result of Plaintiff's impairments, Dr. Baez concluded that Plaintiff would be absent from work about two or three days per month, and that his impairment lasted or could be expected to last at least twelve months.  (R. 10.)

## II.  Discussion

### a.  Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the

Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see also Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be "liberally applied"; its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

b.   **Availability of benefits**

Disability insurance benefits are available to individuals who are "disabled" within the meaning of the SSA.[1]  To be considered disabled under the SSA, a plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner has promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the

_____

[1]  Disability insurance benefits are available to individuals who became disabled while meeting the insurance status requirements of the SSA.  42 U.S.C. §§ 423(a)(1)(A), 423(c).  The only issue before the Court is whether Plaintiff is disabled.

> [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

    **c.  Analysis**

        **i.  The Appeals Council erred in refusing to consider new evidence**

Plaintiff argues that the Appeals Council erred in failing to consider the reports from Dr. Caramihai and Dr. Baez because both reports include new and material evidence. (Pl. Mem. 11–15.) Plaintiff argues that the evidence is "both new and material" as the reports were authored by "physicians who treated [Plaintiff]" and outline Plaintiff's "functional limitations." (*Id.* at 14, 15.)

The Commissioner argues that the Appeals Council "reviewed additional evidence proffered by Plaintiff . . . and concluded that this evidence did not provide a basis to change the ALJ's decision." (Comm'r Mem. 19.) The Commissioner argues that Dr. Caramihai's report "does not render the ALJ's decision contrary to the weight of the evidence" because (1) Dr. Caramihai "explicitly noted that he based his statements on Plaintiff's own subjective account of

his ability to function [and] . . . does not reference any exam or objective tests, let alone ones from the relevant period," (*id.* at 19); and (2) "the form was inconsistent with the evidence of record during the relevant period," and therefore "deserving of little weight," (*id.* at 20). In addition, the Commissioner argues that Dr. Baez's report contradicts the record "includ[ing] Dr. Baez's own evaluation of Plaintiff in December [of] 2015." (*Id.* at 22–23.)

The Appeals Council must consider evidence proffered by a claimant that is both new and material. 20 C.F.R. § 404.970(b); *see Lesterhuis*, 805 F.3d at 87; *see also Suttles v. Colvin*, 654 F. App'x 44, 47 (2d Cir. 2016) ("Under the Commissioner's regulations, the Appeals Council will consider new and material evidence only if it relates to the relevant period on or before the date of the ALJ's decision."). Evidence is "new" if it is "not merely cumulative of what is already in the record." *Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (quoting *Lisa v. Sec'y of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991)). "Evidence is material if it is relevant to the claimant's condition during the time period for which benefits were denied, and there is a reasonable possibility that the new evidence would have influenced the ALJ to decide the claimant's application differently." *Suttles*, 654 F. App'x at 47 (citing *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)); *see also Maloney v. Berryhill*, No. 16-CV-3899, 2018 WL 400772, at *4 (E.D.N.Y. Jan. 12, 2018) ("In order to qualify as 'material' evidence, the new evidence submitted to the appeals council must be 'both (1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently.'" (alteration omitted) (quoting *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004))).

The Commissioner does not dispute that Dr. Caramihai and Dr. Baez's reports are "new"

(Comm'r Mem. 19–25); accordingly, the Court considers only whether the reports are "material."

The medical source statements submitted by Dr. Caramihai and Dr. Baez are material evidence because there is a "reasonable possibility" that they would have influenced the ALJ's decision. *See Suttles*, 654 F. App'x at 47 (finding that evidence is material if "there is a reasonable possibility that the new evidence would have influenced the ALJ to decide the claimant's application differently").

First, the medical source statements contradict several of the ALJ's conclusions. For example, Dr. Caramihai, who had been treating Plaintiff since November of 2015 (approximately seven months at the time he authored the medical source statement), opined that Plaintiff's symptoms would likely be "severe enough to interfere with attention and concentration needed to perform even simple work tasks," and that Plaintiff is "[i]ncapable of even 'low stress' work," (R. 4), and Dr. Baez opined that Plaintiff is "[s]eriously limited" in carrying out very short and simple instructions, (R. 8). In contrast, the ALJ found that Plaintiff could "perform[] simple, routine tasks." (R. 30.) In addition, Dr. Caramihai explained that Plaintiff is unable to sit or stand for more than twenty minutes without changing positions and that in an eight-hour work day with normal breaks, Plaintiff can sit and stand/walk for less than two hours.[2] (R. 2.) The

---

[2] The Commissioner argues that Dr. Caramihai's report "does not render the ALJ's decision contrary to the weight of the evidence" because Dr. Caramihai "explicitly noted that he based his statements on Plaintiff's own subjective account of his ability to function." (Comm'r Mem. 19.) The Commissioner is correct that next to some of Dr. Caramihai's findings and conclusions, he writes: "as per patient." (*See* R. 2, 3.) However, this note is not included on each page of Dr. Caramihai's report, and, on the two pages on which the note does appear, it is unclear to which conclusions the note applies. Further, the fact that some of the information in Dr. Caramihai's medical source statement came from Plaintiff does not render the statement immaterial. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (holding that "[t]he fact that [a treating physician] also relied on [the plaintiff's] subjective complaints hardly

ALJ found that Plaintiff is able to sit, stand, and walk for a total of eight hours in an eight-hour workday, with the ability to sit/stand at will in the vicinity of the workstation.  (R. 30.)  Further, Dr. Baez explained that Plaintiff suffers from "[a]nhedonia or pervasive loss of interest in almost all activities," decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, and difficulty thinking or concentrating, (R. 7), and Dr. Caramihai stated that Plaintiff suffers from pain, depression, and anxiety, (R. 1).  The ALJ found that Plaintiff "consistently had a normal mood and appropriate affect at physical examinations, with no depression, anxiety, or other psychiatric symptoms reported or observed." (R. 34.)

Because the medical source statements contradict the ALJ's conclusions, there is a reasonably possibility that they would have influenced her decision and are therefore material. *See Suttles*, 654 F. App'x at 47 (Evidence is material if "there is a reasonable possibility that the new evidence would have influenced the ALJ to decide the claimant's application differently."); *Beede v. Comm'r of Soc. Sec.*, No. 12-CV-1072, 2013 WL 5217673, at *6 (N.D.N.Y. Sept. 16, 2013) (finding new evidence material in part because it "contradict[ed] the ALJ's conclusion").

Second, the medical source statements bolster Plaintiff's testimony, parts of which the ALJ found were inconsistent with the record.  For example, Plaintiff testified that he has suffered from asthma for over fifteen years, (R. 150), has to "stay away from smoke" (R. 150), and is allergic to dust mites, dirt, trees, grass, and pets, (R. 152).  Dr. Caramihai opined that Plaintiff needs to avoid dust, fumes, gasses and hazards due to his asthma/COPD.  (R. 4).  Further,

---

undermines his opinion as to her functional limitations, as a patient's report of complaints, or history, is an essential diagnostic tool." (alteration, citation and internal quotation marks omitted)).

Plaintiff testified that he has tried to hurt himself, and is depressed and hopeless with little energy and has difficulty with concentration and memory, (R. 172), and Dr. Baez opined that Plaintiff has decreased energy, thoughts of suicide, feelings of guilt or worthlessness, and difficulty thinking or concentrating, (R. 7). Plaintiff testified that he can walk for a block or two before needing to stop, (R. 157), and Dr. Caramihai states in his medical source report that Plaintiff can walk for one city block without needing to rest, (R. 2). Plaintiff also testified that when he moves his hands, he "get[s] numbness" in his hands and arms, (R. 160), and Dr. Caramihai states that Plaintiff will "sometimes need to take unscheduled beaks during the working day" because of "[p]ain/paresthesias, numbness," (R. 2–3).

The ALJ did not specify which parts of Plaintiff's testimony she concluded were "not entirely consistent with the evidence," (R. 39), but the medical source statements are, as described above, generally consistent with Plaintiff's testimony. The fact that the medical source statements are inconsistent with the ALJ's conclusion that Plaintiff's testimony should not be credited suggests that they are material. *See McIntire v. Astrue*, 809 F. Supp. 2d 13, 22 (D. Conn. 2010) (finding evidence material because it was "probative" of the plaintiff's claims in part because it "tend[ed] to make [the plaintiff's] subjective complaints . . . more credible").

Third, the medical source statements are consistent with medical opinions to which the ALJ assigned limited weight. For example, the ALJ stated that "[l]imited weight has been accorded to the opinions of Dr. Thomas . . . that [Plaintiff] should limit/eliminate lifting, pushing, pulling, carrying, stooping, bending, and reaching; is limited to a low stress work environment; and should avoid dust, smoke, odor, and fumes." (R. 40.) The ALJ assigned limited weight to this opinion because it is "vague, and inconsistent with the medical evidence as a whole." (R. 40.) Dr. Caramihai's report indicates that Plaintiff can rarely lift and carry less

than ten pounds and can never lift or carry more then ten pounds, and that Plaintiff can never

twist, stoop (bend), crouch/squat, climb stairs or climb ladders.  (R. 3.)  Dr. Caramihai also

opined that Plaintiff should avoid dust, fumes, gasses, and hazards.  (R. 4.)

The fact that Dr. Caramihai's medical source statement is consistent with Dr. Thomas'

opinion, to which the ALJ assigned limited weight, suggests that Dr. Caramihai's medical source

statement is material new evidence.  *Davidson v. Colvin*, No. 12-CV-316, 2013 5278670, at *7

(N.D.N.Y. Sept. 18, 2013) (adopting report and recommendation finding new evidence material

because it was consistent with an opinion to which the ALJ assigned "no weight").

Accordingly, the Court finds that both Dr. Caramihai's and Dr. Baez's medical source

statements are material.  Because the Appeals Council failed to consider the medical source

statements, the Court remands this case for further consideration in light of the medical source

statements.  *Garcia v. Comm'r of Soc. Sec.*, 208 F. Supp. 3d 547, 552 (S.D.N.Y. 2016) ("Where

the Appeals Council fails to appropriately consider new and material evidence . . . the proper

course for the reviewing court is to remand the case for reconsideration in light of the new

evidence." (citation and internal quotation marks omitted)); *Shrack v. Astrue*, 608 F. Supp. 2d

297, 302 (D. Conn. 2009) (stating that when the Appeals Council "fails to [consider new and

material evidence], the proper course for the reviewing court is to remand the case for

reconsideration in light of the new evidence").[3]

---

[3]  Because the Court remands the case on the grounds that the Appeals Council failed to
consider new evidence, the Court declines to consider Plaintiff's argument that the ALJ erred in
failing to properly assess the impact of Plaintiff's obesity on his severe impairment.

### III. Conclusion

For the foregoing reasons, the Court grants Plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case for further proceedings consistent with this Memorandum and Order.

Dated: March 30, 2019
      Brooklyn, New York

SO ORDERED:

_____
    s/ MKB
MARGO K. BRODIE
United States District Judge